UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| COMPASS BANK, | ] |
|    Plaintiff(s), | ] |
| vs. | ]    CV-01-N-0576-S |
| BLITZ MEDIA, INC., | ] |
|    Defendant(s). | ] |



ENTERED
JUL 1 8 2001

MEMORANDUM OF OPINION

    This is an action by Compass Bank ("Compass"), an Alabama corporation with its principal place of business in Alabama. Compass alleges defendants Brian MacGregor ("MacGregor") and Blitz Media, Inc. ("Blitz Media") breached the terms of various Visa/MasterCard Merchant Agreements and defendants William Powell ("Powell") and/or Allied eCommerce ("Allied") breached the terms of an Indemnification Agreement. Compass further alleges the defendants engaged in a scheme to defraud. Compass seeks damages for, *inter alia*, breach of contract, fraudulent misrepresentation, and fraudulent suppression. Jurisdiction is based on diversity of citizenship. 28 U.S.C. § 1332.

    The cause is presently before the Court for consideration of motions by Blitz Media and MacGregor (Doc. 16) and by Allied and Powell (Doc. 42) to dismiss for lack of personal jurisdiction or improper venue. 28 U.S.C. § 1391(a), (c); Fed. R. Civ. P. 12(b)(2), 12(b)(3). Alternatively, the defendants move to transfer venue to the District of Nevada. 28 U.S.C. §§ 1404(a), 1406(a).   Blitz Media and MacGregor also filed a motion to strike which is

under submission. (Doc. 38).

I.     Disposition.

(1) The Motion to Strike, (Doc. 38) is GRANTED IN PART and DENIED IN PART, for the reasons set out herein.

(2) The Motion to Dismiss or Transfer of Blitz Media and MacGregor is DENIED. (Doc. 16)

(3) The Motion to Dismiss or Transfer of Allied and Powell (Doc. 42) is DENIED.

II.    The Motion To Strike.

Blitz and MacGregor moved to strike the affidavit of Gregory Deming, claiming Deming's affidavit is not based on personal knowledge, includes conclusory statements, and is based on hearsay and opinion.

Mr. Deming is Executive Vice President and General Auditor for Compass and his duties include investigating merchants who process credit card transactions through Compass, including the Blitz entities. (Deming Aff., Doc. 33, hereinafter "Deming Affidavit"). As General Auditor for Compass, Mr. Deming is competent to testify about matters within the scope of his duties, including the general procedures followed by Compass in procuring and processing merchant bankcard accounts, the procedure regarding ISO's in general and the Compass contractual relationship with Powell in particular, and the documents maintained in the ordinary course of business at Compass. (Deming Aff. ¶¶ 4-12, 13-15). His statement about Powell's relationship with Blitz Media, to the extent it is based on the fruits of his investigation, including the statement of David Cuvellier (Doc. 33), and Exhibit C, a signed and dated document. (Deming Aff. ¶ 15), is admissible. To the extent he draws ultimate conclusion of facts based on the evidence,

the court notes that Compass is entitled to all reasonable inferences in its favor. Therefore, to the extent Mr. Deming's reasonable inferences are supported by the evidence, the court will consider them in that light. *Ruiz de Molina v. Merritt & Furman Ins. Agency*, 207 F.3d 1351, 1356 (11th Cir. 2000).

In paragraph 16 of his affidavit, Mr. Deming made statements about Powell's residency which do not appear to be within his personal knowledge or supported by the evidence. In paragraph 18, Mr. Deming made one statement about Mr. Brockman which does not appear to be within his personal knowledge or supported by the evidence. Compass has not made any showing that Mr. Deming is competent to testify as to these matters. Furthermore, Exhibits D and E to the Deming Affidavit are unsigned and unauthenticated documents. Accordingly the following portions of the Deming Affidavit will be stricken:

(1) All of paragraph 16.

(2) The following sentence from paragraph 18: "Mr. Brockman, a former neighbor of Powell's and a J.C. Penny's salesperson in Kansas City, Missouri, has no ownership whatsoever of Blitz Media."

(3) Exhibits D and E.

The remainder of the affidavit will be considered.

III. Statement of Facts.

    A. Scope of Review.

A plaintiff seeking to obtain jurisdiction over a nonresident defendant need only allege sufficient facts to make out a prima facie case of jurisdiction. *Posner v. Essex Insurance Co.*, 178 F.3d 1209, 1215 (11th Cir. 1999). When the party challenging

jurisdiction submits affidavits in support of his position, the plaintiff then must come forward with affidavits showing the basis on which jurisdiction may be obtained. *Id.* In considering the affidavits, the court must not credit conclusory allegations or draw farfetched inferences, but shall take facts affirmatively alleged by plaintiff as true and shall construe the disputed facts in a light most hospitable to the plaintiff. *Id.* Even when a defendant submits evidence supporting his jurisdictional position, the court must still accept the facts alleged in the complaint as true to the extent they are uncontroverted by defendant's affidavits. *Id., citing Madara*, 916 F.2d at 1514. If there is a conflict between the plaintiff's and the defendant's evidence, the plaintiff's evidence is to be believed and all reasonable inferences drawn in his favor. *Ruiz de Molina*, 207 F.3d at 1356. Accordingly, for the present motion, this court will consider the allegations of plaintiff's complaint to the extent they are uncontradicted by the evidence, plaintiff's evidence, and defendant's evidence to the extent it does not conflict with the plaintiff's evidence. The plaintiff must present a prima facie case of jurisdiction. Id.

B.   The Facts.

The plaintiff in this action, Compass, processes credit card sales for merchants who have entered into a "Merchant Agreement" with Compass. (Deming Aff. ¶ 4, Exhibit A). Compass makes such contracts based on information in application forms submitted by the merchants, including financial information about, *inter alia*, the merchant's industry, anticipated monthly volume of sales, the owner's credit history, and past credit card transactions. (Compl. ¶ 12; Deming Aff. ¶¶ 5-7). The agreements include an Alabama "choice of law" provision, and Compass's Alabama address two lines below the signature line for the applicant. (Deming Aff. ¶4, Exhibit A). The agreements between Compass and

its merchants incorporate the Operating Guidelines of MasterCard and VISA, and each of the merchants warrants to Compass that it will comply with the Operating Guidelines. (Deming Aff. ¶ 11, Exhibit A).

Compass claims the defendants entered into a conspiracy to defraud Compass by submitting false information on application forms which led Compass to agree to process merchants which it otherwise would never have agreed to process. The scheme allegedly proceeded as follows:

Powell, doing business as "Allied Merchant Processing," contracted with Compass to "engage in independent marketing of merchant bankcard processing services for the bank." (Compl. ¶ 15; Deming Aff. ¶ 14).[1] Compass avers that Powell/Allied is an "ISO," an independent sales organization that, on behalf of merchants, locates banks to do their credit card processing. (Compl. ¶ 14; Deming Aff. ¶ 13).

Among the merchants Powell proposed and Compass accepted were defendants Quarter Map, Beautiful Nails, Golf Directory, Paradise Directory, Info Direct, Inc., Sport Relief, UPLIGHT, and Wash Ball. (Compl. ¶¶ 17, 18; Deming Aff. ¶ 18). Compass alleges that none of these merchants existed and were actually "doing business as" entities of Blitz Media. (Compl. ¶18; O'Connell Aff. Doc. 19, Exhibit A). Based on the representations in the applications, Compass opened accounts for seven Blitz entities on June 20, 2000, and additional accounts were opened on December 13, 2000 and December 21, 2000.

---

[1] The record includes two Powell/Compass ISO Agreements. One is dated July 10th, 1999, with the "July" and "10th" handwritten into blanks on a contract form, but the 1999 date included is as part of the contract form. The second agreement is dated August 9, 2000, with the 1999 part of the contract form marked through and the date 2000 handwritten below. Smith attested that Powell did not become an ISO for Compass until sometime after May 2000. (Smith Aff., Doc. 33, Exhibit B). Powell was looking for a bank processor for Blitz Media by late 1999. (Cuvellier Aff., Doc. 33). Randy O'Connell, vice president of Blitz Media, stated that he saw only the agreement dated 1999, and that he believed Powell was Compass's agent. (O'Connell Aff., Doc. 19, Exhibit A). To the extent it is relevant to this motion to dismiss, Compass is entitled to the reasonable inference from this conflicting evidence that Powell was affiliated with Blitz prior to his association with Compass.

(Compl. ¶ 31; Deming Aff. ¶ 17).[2]

Compass would have rejected the accounts if MacGregor[3] had signed the applications because Compass would have found from the MasterCard Match File that the Blitz Media entities and MacGregor had previously been terminated by at least five bank card processors for violations of merchant agreements. (Compl. ¶ 21; Ludlow Aff., Doc. 33). The applications were signed by Kristopher Brockman or Gina Gaede[4] and did not reference Blitz Media.[5] (Compl. ¶¶ 19-22; Deming Aff. ¶18, Smith Aff., Michel Aff., Doc. 33). On May 30, 2000, Blitz Media paid Kristopher Brockman $10,000 via a check signed by MacGregor, and Brockman paid $5000 to Powell. (Compl. ¶ 21; Deming Aff. ¶ 18, Exhibits G and H).[6] On June 1, 2000, Brockman and MacGregor signed a "Purchase Agreement" purporting to transfer ownership of the Blitz Media entities from Brockman to MacGregor for the sum of $10,000. (Deming Aff. ¶ 18, Exhibit G).

---

[2] Blitz Media markets a variety of products to consumers via television "infomercial" broadcasts and its customers place orders for these products and services by calling a toll-free number and charging the desired items to a credit card. (O'Connell Aff., Doc. 19). The Blitz products include Quarter Map, Beautiful Nails, Golf Directory, Paradise Value Discount Directory, Sport Relief, Uplight and Wash Ball. *Id.*

[3] MacGregor is the President, Secretary and Treasurer of Blitz Media.

[4] Gaede visited Decatur with Powell and was introduced as his fiancee. (Compl. ¶ 4; Smith Aff., Doc. 33).

[5] Attached as an exhibit to the Motion to Dismiss of Blitz Media and MacGregor is an application they claim was submitted to Powell which correctly identified Blitz Media as the merchant making the application, and correctly listed Brian MacGregor as the owner. The financial information included Blitz Media's federal taxpayer number and stated that average monthly sales for Blitz Media would be approximately $5 million. (O'Connell Aff., Doc. 16, Exhibit A). Mitzi Smith, Financial Analyst in the Merchant Services Department of the BankCard Operations division of Compass, attested that application does not have any processing marks or signatures indicating it had been processed by Compass. (Smith Aff., Doc. 33, ¶¶ 6-7). On this motion to dismiss, the evidence submitted by Compass is to be believed and all reasonable inferences drawn in its favor. *Ruiz de Molina*, 207 F.3d at 1356. Accordingly, the court will assume that the applications Compass received and processed included the factual misrepresentations set out in the statement of facts, despite the defendants' contrary evidence. Further, Compass is entitled, for purposes of this motion only, to the reasonable inference that the applications it received were submitted with the knowledge of all the defendants.

[6] Compass claims Brockman never had an ownership interest in the Blitz Media entities and that MacGregor actually paid Brockman to sign the Merchant Applications submitted to Compass. Compass also claims the evidence of the simultaneous payment from Brockman to Powell supports the inference that Powell was involved in the scheme and acting on behalf of Blitz and MacGregor rather than Compass. Again, these are reasonable inferences from the evidence to which Compass is entitled for the purpose of this motion only.

Compass further avers defendant Johnny Harper, who was a manager for merchant accounts at Compass, participated in the conspiracy to defraud Compass by entering false information in Compass files and computers, reporting false credit scores for these nonexistent merchants, allowing the submission of multiple applications for one merchant, coding the merchants as being in a lower risk industry (such as direct marketing) rather than a high risk industry (such as telemarketing), and failing to report the high volume merchants to Compass in monthly and year-end reports. (Compl. ¶¶ 7, 25; Deming Aff. ¶ 7). Powell visited Harper at the Compass offices in Decatur, Alabama in August or September of 2000 to bring merchant applications, including applications for two Blitz Media entities, and to resolve problems related to merchant accounts Powell had placed with Compass. (Smith Aff., Doc. 33). Harper visited the Blitz Media Nevada offices in September 2000. (O'Connell Aff., Doc. 16, Exhibit A). Harper also approved the creation of a Compass account for Blitz Media entity "InfoDirect" in December 2000 after VISA complained about the activity in the Paradise Directory account. (Deming Aff. ¶ 19, Smith Aff., Doc. 33, ¶ 9). MacGregor completed an application for "InfoDirect" in February 2001, just prior to the termination of all the Blitz Media Compass accounts. (Smith Aff., Doc. 33, ¶ 9).

Compass also claims that the applications of the Blitz Media entities listed anticipated monthly volume of sales for each merchant at $50,000 or below, so that Harper was authorized to approve the applications without presenting them to Compass's Loan Department or other Compass employees. (Compl. ¶¶ 13, 23; Deming Aff. ¶ 7). Blitz Media submitted in excess of $37 million dollars in sales through the Compass accounts, and has been paid in excess of $20 million dollars by Compass. (Compl.

¶ 18; Deming Aff. ¶ 17).

Compass claims that it has refunded approximately $14 million dollars because of chargebacks and credits of the Blitz Media entities. (Compl., ¶ 42). Under the terms of its agreement with VISA/MasterCard, Compass must refund money whenever a cardholder disputes the authorization of a charge (a "chargeback") or when a cardholder returns goods (a "credit). (Compl. ¶¶ 34, 35; Deming Aff. ¶¶ 8-12; Chambers Aff., Doc. 33). The Blitz Media entities averaged over 250 chargebacks per month, and Compass dealt with Powell whenever a chargeback regarding one of the Blitz Media entities occurred. (Smith Aff., Doc. 33). Pursuant to the VISA/MasterCard Operating Guidelines which are incorporated into the Merchant Agreement, consumer dispute chargebacks cannot exceed 1% of the total transactions for a single merchant, and credits cannot exceed 30 % per merchant. (Compl. ¶ 37; Deming Aff. ¶¶ 11-12). Compass avers that the combined chargeback and credit percentages for the Blitz Media entities have far exceeded the VISA/MasterCard requirements since the beginning of the relationship, and that Compass will be penalized up to $1,000,000 if the excess chargebacks and credits continue. (Compl., ¶¶ 38, 39). Compass had total losses of $112,739 resulting from chargebacks and credits as of May 1, 2001, and it projects that its final losses will exceed $1.5 million. (Deming Aff. ¶17). Compass halted processing for all Blitz Media entities on February 20, 2001. (Compl. ¶ 41; Smith Aff., Doc. 33).

Blitz Media is incorporated under the laws of the State of Nevada and has its headquarters and principal offices in Las Vegas, Nevada. (O'Connell Aff., Doc. 19). Blitz Media is not qualified to transact business in Alabama and does not have any agents or employees in Alabama. *Id.* MacGregor is a resident California. (MacGregor Aff., Doc. 19).

There is no evidence that MacGregor ever had direct contact with Alabama. Powell is a resident of Nevada and Allied is a Nevada corporation with its principal place of business in Nevada. Compass investigated chargebacks made by customers using Compass issued credit or debit cards and discovered that 16 Compass customers in Alabama disputed charges placed on their credit card by Blitz Media. (Chambers Aff., Doc. 33). Blitz Media experienced a total of 11,560 consumer initiated chargebacks involving credit cards issued by banks in at least 37 states. Id.

IV.    The Motions To Dismiss.

A federal court sitting in diversity may exercise jurisdiction over a nonresident defendant to the same extent as a court of that state. *Ruiz de Molina*, 207 F.3d at 1355, citing *Prejean v. Sonatrach, Inc.*, 652 F.2d 1260 (5th Cir. Unit A 1981). Alabama's long arm statute extends to the limit allowed under the Due Process Clause of the Fourteenth Amendment to the Constitution. Ala. R. Civ. P. 4.2(a)(2)(1); *Alabama Waterproofing Co. v. Hamby*, 431 So. 2d 141, 145 (Ala. 1983). Therefore, an Alabama court can summon a nonresident defendant to this forum if the defendant has "minimum contacts" with the state and the exercise of personal jurisdiction over that defendant would not offend "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

A.    Minimum Contacts.

General personal jurisdiction arises from a party's "continuous and systematic" contacts with the forum state. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416-17 (1983). Specific personal jurisdiction is based on the party's contacts with the forum state that relate to the cause of action. *Madara v. Hall*, 916 F.2d 1510, 1516 n. 7

(11th Cir. 1990). To assert specific personal jurisdiction over a nonresident party, due process requires that the party have "fair warning" that a particular activity may subject him to the jurisdiction of the forum state. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985); *Shaffer v. Heitner*, 433 U.S. 186, 218 (1977). The "fair warning" requirement is satisfied if the party has "purposefully directed" his activities at the forum and the litigation results from alleged injuries that "arise out of or relate to" those activities. *Madara*, 916 F.2d at 1516, citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984); *Burger King*, 471 U.S. at 472. The defendant's conduct and connection with the forum must be such that he should reasonably anticipate being haled into court there. *Ruiz de Molina,* at 1356. The defendant will not be haled into a jurisdiction because of random, fortuitous, or attenuated contacts or because of the unilateral activity of a third person. *Madara*, 916 F.2d at 1516. The foreseeability critical to the proper exercise of personal jurisdiction is the ability to see that the defendant's own purposeful acts will have some effect in the forum. *Id.*, citing *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 297 (1980).

  Compass has presented sufficient evidence to support a reasonable inference that the defendants engaged in a scheme to defraud Compass. The evidence tends to show MacGregor, Powell, and Harper engaged in activities calculated to induce Compass to open merchant accounts for Blitz Media with knowledge that Compass would not have agreed to open the accounts absent misrepresentations and suppression of information about Blitz Media and MacGregor. There is a reasonable inference that all the defendants, including those who never traveled to Alabama, were aware that the effects of their activities would be in Alabama. There is evidence that all the defendants participated in submitting the fraudulent applications, including the procurement of fraudulent signatures.

The defendants "purposefully directed" their activities at the forum, in that the victim of the scheme was a bank located in Alabama. This litigation is the direct result of alleged injuries that "arise out of or relate to" the defendants' allegedly fraudulent activities. *Madara*, 916 F.2d at 1516. In these circumstances, the defendants should have anticipated being haled into an Alabama court should a claim arise out of their conduct. *Ruiz de Molina*, 207 F.3d at 1358.

The defendants argue that the alleged fraud occurred in Nevada because Powell allegedly solicited Blitz Media in Nevada, Powell received the merchant applications in Nevada, and Harper met with Blitz Media employees in Nevada. This argument presupposes that Powell and Harper were acting as agents of Compass with respect to their dealings with Blitz Media and MacGregor. However, Compass has presented evidence tending to show that Powell and Harper were in league with Blitz Media and MacGregor and were not acting on behalf of Compass with regard to their activities directed at opening the bank card merchant accounts for Blitz Media. The claim that Compass was defrauded by its own employees' "unilateral activity" is contradicted by the evidence that Blitz Media and MacGregor were the clear beneficiaries of the fraudulent activity. Thus, there is a reasonable assumption that Harper and Powell were acting on behalf of MacGregor and Blitz Media rather than engaging in "unilateral activity," unrelated to any activity of Blitz Media or MacGregor. *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).

There was significant activity in Alabama furthering the alleged scheme to defraud. The allegedly fraudulent applications were submitted to Compass in Alabama, Powell visited Compass's Alabama offices, Harper undertook a number of activities to avoid detection of the scheme by other Compass employees, Compass relied on the

misrepresentations and accepted the Blitz Media entities' accounts, and MacGregor belatedly submitted at least one application to Compass, which included the Compass Alabama address two lines under his signature.[7] It is also significant that Blitz Media processed $37 million in sales through Compass during the course of their dealings. Though defendants claim the charges were submitted to an intermediary in Nevada, it is a fair inference that they knew the charges would ultimately be paid by Compass pursuant to the Merchant Agreements and that the intermediary was acting as Blitz Media's agent in transferring the bank card charge information. The defendants here chose to do business with an Alabama resident in Alabama and they expected to receive and did receive a benefit from that business. *Ruiz de Molina*, 207 F.3d at 1356; see also Leventhal v. Harrelson, 723 So.2d 566 (Ala. 1998) (finding Alabama had personal jurisdiction of a Georgia resident who influenced the decision of Alabama pension plan trustees to invest in limited partnership though he never traveled to Alabama to discuss the investment).

      B.      Fair Play and Substantial Justice.

If the party's contact with the forum state is sufficient to establish the constitutionally established minimum, the next consideration is whether the exercise of personal jurisdiction over them comports with "fair play and substantial justice." *Burger King*, 471 U.S. at 476. Relevant factors include "the burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient

---

[7]Although Compass never processed any application submitted with MacGregor's signature, it did receive an application from MacGregor in February 2001. Further, there is evidence supporting the inference that MacGregor solicited the signatures on the applications which were processed by Compass.

R:\Nelson\Clerk3\Compass v. Blitz\ModisPersonal Jurisdiciton.wpd

resolution of controversies and the shared interest of the states in furthering fundamental substantive social policies. *Madara*, 916 F.2d at 1517, *citing Burger King*, 471 U.S. at 477, and *World-Wide Volkswagen*, 444 U.S. at 292.

The State of Alabama has a strong interest in providing an effective means of recovery for an Alabama resident who has been damaged in circumstances of alleged fraud. *Ruiz de Molina*, 207 F.3d at 1358. Compass's interest in bringing its claim of fraud in Alabama is substantial, since the documents and other evidence that led Compass to believe it has been defrauded are in the state. The burden on Blitz Media in litigating in this state is mitigated by "modern methods of transportation and communication." *Posner*, 178 F.3d at 1221, *citing Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253 (11th Cir. 1996). Although Blitz Media filed a Nevada action against Compass just days after Compass commenced the action here, the litigation can be efficiently pursued through coordinated discovery or, perhaps, transfer of the Nevada action here for consolidation with this case.

Accordingly, this court finds that defendants have sufficient contacts with Alabama with respect to the events giving rise to this litigation, and haling them into court here will not offend traditional notions of fair play and substantial justice.

V.   The Motions to Transfer.

   A.   Venue.

In a civil action in which jurisdiction is based on diversity of citizenship, venue is appropriate if any one of the three requirements of 28 U.S.C. § 1391(a) are met, or if the requirements in 1391 (c) are met. Venue in this action is proper in the Northern District of Alabama because, as set out above, "a substantial part of the events or omissions giving rise to the claim occurred" here. 28 U.S.C. § 1391(a)(2).

    B.    Forum Non Conveniens.

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). The plaintiff's choice of forum should not be disturbed unless the movant can show that it is clearly outweighed by other considerations. *Robinson v. Giarmarco & Bill, P.C.,* 74 F.3d 253, 260 (11th Cir. 1996). Compass has presented evidence showing that numerous records and documents relating to the transactions between Compass, Powell, and Blitz Media, totaling thousands of pages, are located at its Decatur, Alabama facility. (Smith Aff., Ludlow Aff., Doc. 33). Most, if not all, of the Compass employees who have information about the transactions are located in Alabama. *Id.* Although there will be information and witnesses in Nevada which relate to this lawsuit, a transfer of venue would merely transfer the inconvenience from the defendant to the plaintiff. *Id.* Accordingly, the motions to transfer will be denied.

VI.    Conclusion.

A separate order in accord with this memorandum of opinion will be entered. Done, this 17th of July, 2001.

 

                                       EDWIN L. NELSON
                                 UNITED STATES DISTRICT JUDGE